## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 14 2015, 9:34 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Gary, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

Br.S & B.S.

And

E.S. (Mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 14, 2015

Court of Appeals Cause No. 45A05-1408-JT-377

Appeal from the Lake Superior Court.

The Honorable Thomas P. Stefaniak, Jr., Judge.

Cause No. 45D06-1312-JT-264 & 45D06-1312-JT-265

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, E.S. (Mother), appeals the trial court's Order terminating her parental rights to her twins, B.S. and B.S. (the Children).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as: Whether there was sufficient evidence to support the termination of Mother's parental rights.

## FACTS AND PROCEDURAL HISTORY

On November 23, 2012, Mother went to St. Anthony Health Hospital in Crown Point, Indiana, for an emergency C-section. Upon admission, Mother's urine was subjected to testing and she "yielded a blood alcohol level of 0.168." (Transcript p. 130). Mother gave birth to premature twins, a boy and a girl.[1] The following day, the hospital called the Department of Child Services (DCS) and reported the incident. On November 25, 2012, DCS commenced its investigation by sending family case manager, Davis Shelby (FCM Shelby), to visit Mother in hospital. FCM Shelby learned that the Children were born with

---

[1] M.H. was named as the Children's father. During the pendency of this case, paternity was never established. He is not a party to this appeal.

alcohol in their system and were suffering from withdrawal. He also established that Mother had three other children.[2] G.S. and T.S aged, five and six respectively, tested for positive for cocaine at birth. Mother's parental rights had been terminated, and both children had been adopted by Mother's parents (Grandparents). In addition, Grandparents were appointed as legal guardians to Mother's oldest child, C.G., after Mother's attempt to commit suicide. Mother admitted to FCM Shelby that she drank alcohol before delivering the Children, however, she claimed that she had been sober for the duration of her pregnancy. Mother confessed that she smoked marijuana but only when she was nauseous. Mother stated that she had a past cocaine addiction but had been clean for several years.

[5] On December 4, 2012, DCS filed a petition alleging that the Children were children in need of services (CHINS) based on Mother's drug and alcohol abuse. That same day, the trial court held a joint detention and initial hearing and found that the Children's removal from Mother's custody was in their best interest. The trial court then granted temporary wardship of the Children to DCS and ordered placement of the Children with Grandparents once they were discharged from hospital. The record shows that placement of the Children

---

[2] Mother's other children are not part of this appeal.

with Grandparents proved to be unsuccessful since Grandparents already had their hands full with G.S. and T.S. In addition, Grandparents claimed that they "could not take on two newborns with special needs" due to grandfather's diminishing health, and grandmother working full-time. (Tr. p. 132). On November 30, 2012, DCS was forced to place the Children in foster care. On February 20, 2013, the trial court held a dispositional hearing on the CHINS petition, at which Mother was ordered to participate in counseling, visit the Children, complete a substance abuse assessment, submit to random drug screens, allow random DCS visits, undergo a psychological evaluation, maintain stable housing and employment, and remain drug free.

[6] Thereafter, Mother sporadically submitted to drug screens, and she tested positive for cocaine on at least four occasions. On April 30, 2013, Akia White (White), a drug tester with Metropolitan Oasis, was sent to Mother's residence to conduct a hair follicle drug screen. When White arrived, there were several cars in the driveway and it appeared as if Mother was hosting a party. As she approached the front door to the house, she detected the smell of burnt marijuana coming from inside. White knocked and she was let in. "[T]hree or four guys" were sitting on the couch, and as soon as White walked inside, they "put out the marijuana." (Tr. p. 85). One of the male friends called for Mother and announced White's presence. According to White, Mother was "fidgety and fumbling. Her clothes were disheveled. Her hair was kind of all over her head. She looked like she had been up, maybe, for a few days. [Her] make[-]up was [] running. [She] was sweating and couldn't stand still." (Tr. p. 88).

White suspected Mother was under the influence. In the kitchenette area, White requested Mother to submit to a hair follicle drug screen. Mother, however, declined to submit to one, she stressed that she did not understand the nature of the test, and that she needed to speak to her lawyer. In turn, Mother asked White if she could postpone the assessment until the next day. White rejected Mother's request since drug screens were intended to be random.

[7] Due to Mother's prolonged drug history, DCS recommended that Mother should attend, at the least, a lengthy inpatient substance abuse treatment program. Mother attended a nine-day program at Sycamore Springs in Lafayette, Indiana in July 2013. Mother had been diagnosed with Bipolar disorder at age sixteen and she also suffered from ADHD. Mother was required to complete a psychological assessment for her mental health issues during the CHINS proceedings, which she failed to do.

[8] As for Mother's supervised visits with the Children, several problems surfaced. Out of twenty-one visits, Mother only attended thirteen. Furthermore, the visitation supervisor observed that Mother's interaction with the Children was unsuitable. As mentioned earlier, the Children were born premature, and because their skulls had not fully developed, they had to wear helmets. Yet, enough, Mother was extremely rough with the Children, and she did not understand the interaction required for two special needs babies. On March 11, 2013, DCS filed a request to suspend Mother's supervised visitation. In that petition, DCS alleged that Mother had constantly failed her drug tests and had

not conformed to random drug screens. On March 14, 2013, the trial court granted DCS' petition.

[9] At the review hearing held on July 22, 2013, the court changed the permanency plan from reunification to adoption and termination of parental rights. Also, the trial court ordered that the services be stopped due to Mother's noncompliance. On December 6, 2013, DCS filed its petition to terminate Mother's parental rights to her Children. On July 29, 2014, the trial court conducted an evidentiary hearing. The following day, July 30, 2014, the trial court issued its Order terminating Mother's parental rights to the Children.

[10] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[11] In reviewing the termination of a parent's rights, it is a long-settled tenet of this court that the trial court is entitled to considerable deference. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct .App. 2011). Our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Rather, we will consider only the evidence, and any inferences reasonably derived therefrom, most favorable to the trial court's judgment. *Id*. In addition, Indiana Code section 31-37-14-2 requires that a finding in a termination proceeding "be based upon clear and convincing evidence." Accordingly, in reviewing whether the trial court's findings or judgment are clearly erroneous, we must determine "whether the evidence clearly and

convincingly supports the findings and the findings clearly and convincingly support the judgment." *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).

## II. *Termination of Mother's Parental Rights*

[12] The traditional right of parents to direct the care, custody, and control of their "children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d at 1259 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution prevents the State from unduly interfering with parents' decisions regarding the upbringing of their children. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014). However, parental rights are not absolute; in fact, they are "subordinate [ ] to the children's interests when the children's emotional and physical development is threatened." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*.

[13] A court may terminate parental rights "when parties are unable or unwilling to meet their responsibility as parents." *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Because the termination of parental rights permanently severs the parent-child relationship, it is an extreme sanction that "is intended as a last resort, available only when all other reasonable efforts have failed." *C.A.*, 15 N.E.3d at 92. The purpose of termination is to protect the children, not to punish the parents. *Lang*, 861 N.E.2d at 371. In such cases, Indiana law stipulates that DCS must establish, in part,

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in

the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each statutory element by clear and convincing evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's conclusion that there is either a reasonable probability that the conditions necessitating the Children's removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children's well-being, as well as that termination is in the Children's best interests.

### A. *Reasonable Probability that Conditions Will Not Be Remedied*[3]

In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care

---

[3] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Indiana Code section 31-35–2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Child outside the home will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. A trial court may also consider the services offered to the parent by DCS office and the parent's response to those services as evidence of whether conditions will be remedied. *See* id. at 1252. Finally, we point out that DCS office is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability that a parent's behavior will not change. *See In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[16] As stated above, DCS had to demonstrate, among other things, a reasonable probability that the conditions that resulted in the Children's initial removal

would not be remedied. I.C. § 31-35-2-4(b)(2)(B)(i). Any improvement in Mother's ability to care for the Children since the filing of the CHINS petition is relevant. However, the trial court must also evaluate Mother's habitual patterns of conduct to determine their long-term effect on Mother's short-term improvements. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

[17] This balancing of past conduct in light of present behavior is even more crucial where, as here, the Children at issue have never resided with Mother. As such, our focus is on the conditions that led to DCS's retention of custody and we consider whether there is a reasonable probability that those conditions will be remedied. *In re W.B.*, 772 N.E.2d 522, 530 (Ind. Ct. App. 2002). Here, DCS took custody of the Children because they were born with fetal alcohol syndrome and because Mother admitted that she was addicted to drugs and alcohol. DCS endeavored to engage Mother in various services—including a parenting assessment, substance abuse treatment, random drugs tests, and a psychological evaluation. Mother argues that she "participated fully and addressed her issues head on." (Appellant's Br. p. 11).

[18] Our review of the record reveals that there is ample evidence to support the trial court's findings, which, in turn, support the trial court's ultimate decision to terminate Mother's parental rights to her Children. During the termination hearing, Mother stated that she started using marijuana at age nineteen. By the time she was twenty-five, Mother was using cocaine and she admitted that she was dependent on it for seven years. In addition, Mother confessed to using crack cocaine for two-and-one-half years in 2003. Despite Mother's assertion

that she no longer used cocaine, she repeatedly tested positive during the CHINS proceedings. Moreover, Mother admitted to using marijuana to curb her nausea while pregnant with the Children. Due to Mother's long-term use of drugs, DCS recommended that Mother should participate in an extensive inpatient drug treatment program such as Transitions in Fort Wayne, Indiana. Mother completed only nine days at a different center, and did not comply with DCS' recommendation for additional treatment. At the termination hearing, DCS' family case manager, Jessica Montello (FCM Montello), stated that Mother would have benefited from the Transitions program and Mother's nine-day treatment was insufficient to address her lengthy drug habit.

[19] Mother's therapist informed the trial court that before the services were stopped in July of 2013, Mother's goals were to address her mental and substance abuse issues. The record reveals that Grandparents could not control Mother's delinquent teenage son, C.G., and they returned him to Mother's care. At the evidentiary hearing, Mother's therapist stated that during the CHINS proceedings, Mother was living with C.G., and Mother had a tough time controlling him. Mother's therapist believed that C.G. triggered her drug use. Mother's therapist also believed that Mother had her hands full with C.G. and she informed the court that it would be chaotic and stressful for her, to handle C.G. and a couple of young children with special needs.

[20] As for Mother's mental issues, it is uncontroverted that Mother was diagnosed with Bipolar and ADHD disorders as a teenager. Mother claimed that she regularly took her medication. At the evidentiary hearing, FCM Montello

stated that Mother successfully completed her clinical assessment, however; she was supposed to follow it up with a psychological evaluation. FCM Montello stated that Mother was twice scheduled to undergo a psychological assessment, but Mother failed to appear. Despite Mother's claim that she habitually took her medication, FCM Montello stated that she had received reports from Mother's service providers that Mother was inconsistent with her medication.

[21] It is well-settled that a court does not have to wait for a child to become irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before it can terminate the parent-child relationship. *See In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Given Mother's refusal to address her substance abuse and mental health issues, as well as her noncompliance with the services provided to her, she cannot show that she will be able to provide adequate care or permanency for the Children in the future. In this regard, we agree with the trial court that the termination of Mother's parental rights was appropriate under Indiana Code Section 31-35-2-4(b)(2)(B)(ii).

### III. *Best Interests*

[22] Lastly, Mother argues that that there is insufficient evidence to support the trial court's conclusion that termination of the parent-child relationship is in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.F.*, 762 N.E.2d at 1253. In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id.*

On appeal, Mother makes no specific claim regarding the Children's best interests but asserts only that she should be afforded the opportunity raise her Children or at least have a relationship with them. The trial court heard Mother's testimony in this regard, and Mother's current argument is merely an invitation for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871. When DCS removed the Children in 2012, the Children were a few weeks old. At the time of the termination hearing, the Children were nearly two years and had been out of Mother's care for their entire lives. FCM Montello testified that the Children were thriving in foster care, that the foster parents were seeking to adopt them, and that termination of Mother's parental rights is in the best interests of the Children. Mother's drug problem, mental health issues, and her inability to comply with court-ordered services supports the trial court's conclusion that the Children's best interests will be served by the termination of Mother's parental rights. Based upon the totality of the evidence, we are not left with a definite and firm conviction that a mistake has been made. We therefore affirm the trial court's judgment.

## CONCLUSION

Based on the foregoing, we conclude that there was clear and convincing evidence to support the termination of Mother's parental rights.

Affirmed.

Bailey, J. and Barnes, J. concur